McG. LEGGETT, ADMINISTRATOR, v. ATLANTIC COAST LINE RAILROAD COMPANY.

(Filed 9 March, 1910.)

1. **Master and Servant—Assumption of Risk—Master's Negligence.**

   By assuming all those risks naturally incidental to the work he is employed to do, an employee does not thereby assume those arising exclusively from his employer's negligence.

2. **Master and Servant—Carriers of Freight—Dangerous Track— Duty of Master.**

   A carrier is conclusively presumed to have knowledge of the fact that its track has become so out of repair as to be dangerous to its own employees and its passengers, for it is its duty to provide a reasonably safe roadbed.

3. **Master and Servant—Carriers of Freight—Dangerous Track— Negligence—Evidence.**

   Evidence that plaintiff's intestate, a brakeman on defendant railroad company's work train, was seen on a car of its moving train by its engineer, and shortly thereafter, when the engineer looked again, he was missing; that the engineer went back looking for him and found him dead from injuries apparently received by the train passing over him; that the track was in such a dangerous, uneven and bad condition as to probably have caused him to fall from the train and receive the injury; that at place his body was found there was a very rough place and sink in the track, is sufficient to warrant the reasonable inference that the rough condition of the track was the cause of the intestate falling to his death, and take the case to the jury.

4. Same—Corroborative Evidence—Discrepancies.

> And when, in corroboration, a witness testifies that he, at or about the time and place of the occurrence, saw the train with a man on it; that he saw the cars of the train slamming and jarring, suddenly stop, and when it again started he did not see the man again, the next morning again identifying the place by blood on the track, the evidence clearly indicates that the death of the intestate resulted from defendant's negligence, notwithstanding there is a slight discrepancy in this witness's testimony as to the number of cars and the position of the intestate thereon; and such evidence is sufficient to sustain a verdict of defendant's negligence.

APPEAL from *Cooke, J.,* December Term, 1909, of MARTIN. These issues were submitted:

1. Was the plaintiff's intestate killed by the negligence of the defendant company, as alleged? Answer: Yes.

2. Did the plaintiff's intestate, by his own negligence, contribute to his death? Answer: No.

3. What amount of damages is the plaintiff entitled to recover? Answer: $7,229.

From the judgment rendered the defendant appealed. The facts are stated sufficiently in the opinion of the Court.

*A. R. Dunning* for plaintiff.
*F. S. Spruill, H. W. Stubbs* for defendant.

BROWN, J. There are no assignments of error relating to the reception or rejection of evidence, and we think that all the other assignments of error, relating to the charge of the court, may be considered in passing upon the motion to nonsuit. This motion and the several exceptions to the charge are based upon the contention that there is no evidence that the alleged negligence of the defendant was the proximate cause of the intestate's death.

The doctrine of assumption of risk has no application here, for it is not contended by plaintiff that he is entitled to recover unless he should satisfy the jury that the cause of the death of his intestate was the negligence of the defendant.

It is elementary that while an employee assumes all those risks naturally incidental to the work, he does not assume those arising exclusively from his employer's negligence.

The evidence, offered by the plaintiff, tends to prove that the intestate was a brakeman on defendant's freight train running on defendant's belt line around Wilmington. The duties of the train on which he was employed were to shift cars around the belt line to and from the Wilmington yard and the several factories on the belt line; to take out empty cars that

had been unloaded and put in cars loaded with material for the factories, and *vice versa*. On the night of the accident, the engine, with its crew of men, one of whom was the plaintiff's intestate, was at an industrial plant on the belt line known as the Standard Turpentine Works. The train was made up of an engine running tender forwards, pushing two empty box cars and one empty flat car; immediately next the engine in the string of cars being drawn was the one empty flat car. When the work at the Standard Turpentine Works was finished, the signal indicating that the work was done and directing the engineer to go on into the Wilmington yards was given by the plaintiff's intestate, who was then standing on the box car next to the flat car that was attached to the head of the engine. The crew were then six or seven miles out from the Wilmington yards.

In response to the signal given by the plaintiff's intestate, the engineer started with his train back to the Wilmington yards. When the train arrived at Fernside junction, on the way into Wilmington, the engineer discovered that the plaintiff's intestate was missing. The train at once backed back on the track, taking the engine with the flat car at the head of it and the two wood-rack cars behind, and leaving the other cars in the switch at the Delgado Cotton Mills.

They found plaintiff's intestate lying across the track, dead, his body cut in two parts evidently by the train passing over it.

There is abundant evidence in the record that about where the body was found the track was in a fearfully bad condition, quicksand foundation, and water running across the track; that there was a very rough place in the track just where intestate's shoes were found. In fact, the evidence is not contradicted that the entire track of the belt line is in a most unsafe and dilapidated condition. That the defendant is conclusively presumed to have knowledge of it is beyond controversy, because one of its obligations to its employees, as well as to passengers, is to provide a reasonably safe roadbed. *Thomas v. R. R.*, 131 N. C., 592.

There is evidence that while the train was speeding towards Wilmington at twelve miles an hour over this rough, uneven and sinking track, the intestate, as brakemen are called upon to do, was moving along the cars presumably in the discharge of his duties.

It is contended that he fell between the cars and was run over. We think it quite plain, from the undisputed evidence, that the intestate met his death in this manner. We have no difficulty in holding that the evidence warrants the reasonable inference that the rough condition of the track was the cause

of the fall. This is manifest when we consider its condition at and about the place where the body and the shoes were found.

There is another ground of negligence alleged, and supported by evidence of the witness David Baldwin. He testified that on the evening of 3 October, 1907, at about 6:30 o'clock, he was coming home from hunting, and passed within about fifteen or twenty steps of the track of the belt line; that while he was there a freight train passed him with two wood-rack cars in front of the engine and eight or ten cars behind it, going towards Delgado Mills; that he saw a man on the rear part of the train, sitting on the car, his feet hanging down between the cars. He had his lantern, and his right hand on the brake; that about half the distance between Sixth and Seventh streets the train was going a pretty good speed, and stopped all at once, and those cars rushed on the engine and made a most violent slamming and jarring of the cars, and then the train started again; that after the sudden stopping of the train he did not see the man again; that the next morning he was down at the track, and at the point where the cars slammed together he saw evidences of blood, etc., on the ground. At this place the track was in a very uneven, rough and bad condition.

Although this witness may be in error as to the number of cars, the description of the train and the position of the brakeman, yet his evidence is to be considered by the jury upon the main question of negligence. His discrepancies may affect his credibility, but he testifies unequivocally to the violent jarring and slamming. He also testifies to the blood, and it was not far from where the body was found. Undoubtedly, the blood testified to by Baldwin came from the intestate's body. It is not claimed that any one else was killed or hurt on the belt line that night.

That the evidence, taken as a whole, was sufficient to go to the jury, and warrants the reasonable inference that the bad condition of the track and the violent "slamming" of the cars and stopping of the train threw the intestate off his balance between the cars and caused his death is hardly debatable. With due deference to the argument of the learned counsel for defendant, we cannot resist coming to that conclusion ourselves, although we are not triers of the fact.

We find nothing in the evidence to support the plea of contributory negligence, and we find no assignment of error in the brief bearing upon the issue of damage.

No error.